## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Chapter 11** |
| **NEVEL PROPERTIES** | ) | |
| **CORPORATION,** | ) | **Bankruptcy No. 09-00415** |
| | ) | |
| **Debtor.** | ) | |

## ORDER ON OBJECTIONS TO CONFIRMATION OF PLAN

This matter came before the Court on Objections to Confirmation of

Debtor's Third Modified Chapter 11 Plan by Agri Star Meat & Poultry LLC ("Agri

Star") and SHF Industries, LLC n/k/a SHF Holdings, LLC ("SHF Holdings")

(collectively "SHF"). The Court conducted a confirmation hearing and took

extensive post-hearing briefing. Jerrold Wanek represented Debtor, Nevel

Properties Corporation ("Nevel"). Richard Updegraff and Rachel Rowley

represented SHF. Wesley B. Huisinga represented the City of Postville and

Allamakee County. After hearing evidence and considering the arguments of the

parties, the Court took the matter under advisement. This is a core proceeding

under 28 U.S.C. § 157(b)(2)(L).

## STATEMENT OF THE CASE

Nevel owns parcels of property in Postville, Iowa, that it leased to

Agriprocessors, Inc. After entering into the leases, Agriprocessors filed

bankruptcy and SHF purchased substantially all of Agriprocessors' assets.  Nevel

has now also filed Chapter 11 bankruptcy.  Nevel has filed a plan to which no

creditors object.  SHF, however, as an interested party, has filed objections to the

Plan.  SHF's objections stem from its claimed rights in two properties that Nevel

leased to Agriprocessors.  SHF argues that the Plan has not been proposed in good

faith and is not feasible.  As a result, it asks this Court to deny confirmation and

require a new plan that protects the property interests SHF claims.  For the reasons

that follow, the Court overrules SHF's objections and finds the Plan is

confirmable.

## FACTS AND THE PARTIES' ARGUMENTS

Some factual background is helpful in understanding the current

controversy.  The Rubashkin family founded and owned Agriprocessors, Inc. in

Postville, Iowa.  Agriprocessors ran one of the nation's largest kosher meatpacking

and food-processing plants.  At one point, Agriprocessors employed over a

thousand people.  United States v. Rubashkin, 655 F.3d 849, 853 (8th Cir. 2011).

Today the plant remains one of the largest employers in Postville.

On May 12, 2008, U.S. Immigration and Customs Enforcement executed a

criminal worksite enforcement operation at Agriprocessors' plant.  Id.  The

majority of Agriprocessors' workers were undocumented immigrants.  Id.  During

the raid, a total of 389 workers at the plant were arrested.  The raid led to numerous

2

federal criminal charges, including a high-profile case against Agriprocessors'

then-President, Sholom Rubashkin.  See id.

As a result of financial difficulties following the May 2008 immigration

raid, Agriprocessors filed a Chapter 11 bankruptcy petition on November 4, 2008.

The case was eventually converted to Chapter 7.  In the Chapter 7, SHF purchased

virtually all of Agriprocessors' assets, including the processing plant—now run by

SHF under the name Agri-Star.  Nevel owned and still owns property upon which

Agriprocessors maintained services necessary to its own operation.

In addition to owning Agriprocessors, the Rubashkin family also owned and

operated Nevel Properties.  Unlike Agriprocessors, however, the Rubashkin family

still owns and operates Nevel.  Tzvi "Heshy" Rubashkin serves as the sole

shareholder of Nevel.

Confirmation of the Plan in this case—Nevel—is another, difficult, and

messy step in pulling apart these two closely intertwined companies.  The process

is particularly messy given the lack of formality and distinction preserved by

Agriprocessors and Nevel at key moments relevant to this case.  No party,

however, has argued that Agriprocessors and Nevel are not separate and distinct

companies.

Nevel is the title holder of two parcels of property in Postville that became

very important to Agriprocessors' business.  Those parcels are at the center of the

dispute here.  The first is a parcel of property that houses a deep-water well, known as Well #3 (the "Well Property").  The second is a parcel of property that houses two lagoons (the "Lagoon Property").  The Well Property consists of a series of three wells that are interconnected and provide potable water to the Agri Star processing plant (formerly the Agriprocessors plant).  The Lagoon Property consists of two large lagoons and a supporting mechanical plant with an anaerobic lagoon.  The Lagoon Property provides wastewater treatment services for the plant.

The issues involving the two properties—and their effect on the plant and confirmation of this Plan—are controlled by three agreements (and their amendments): 1) An October 4, 2001 Agreement between Nevel and Agriprocessors; 2) An October 4, 2001 Real Estate Lease between the City of Postville and Agriprocessors; and 3) An April 11, 2005 Deep Water Well Lease-Water Line and Access Easements Agreement between Nevel and Agriprocessors. The two October 4, 2001 agreements relate to the Lagoon Property.  The April 11, 2005 lease relates to the Well Property.

In the October 4, 2001 Agreement between Nevel and Agriprocessors, Nevel granted Agriprocessors the right—after certain conditions were met—to obtain title to the Lagoon Property (the "Lagoon Agreement").  The Lagoon Agreement granted to Agriprocessors "all rights in [the Lagoon Property] which are necessary for [Agriprocessors] to hold in order for [Agriprocessors] to grant to the City the

4

rights in the [Lagoon Property]".  (Lagoon Agreement, Signed 10/4/01.)

The purpose of the Lagoon Agreement was for Agriprocessors to gain property rights it needed to enter into the Second October 4, 2001 agreement—a the lease agreement with the City of Postville for the construction of lagoons. Agriprocessors was going to construct two large lagoons in cooperation with the City.  This was the first step in a series of investments by Agriprocessors to create a new sewage system on the west side of Agriprocessors' property.  The Lagoon Agreement allowed Agriprocessors to acquire title from Nevel to the Lagoon Property it needed to convey to the City.  It allowed Agriprocessors to acquire title when a precondition was satisfied.  The Agreement stated, "at such time as the legal description of [the Lagoon Property] has been determined, [Nevel] will convey the [Lagoon Property] to [Agriprocessors] by a general warranty deed free and clear of liens and encumbrances . . . ."  (Id.)  Nevel granted these rights under the Lagoon Agreement to Agriprocessors for the sum of $20.00.[1]

The second October 4, 2001 agreement was designed to help the City address wastewater treatment issues.  The City originally owned four wastewater treatment plants that it used to treat industrial wastewater created by Agriprocessors and a second industrial plant.  Around the end of 2000, wastewater

---

[1] The Lagoon Agreement was amended four years later on January 13, 2005, to specifically acknowledge and consent to the leases between Agriprocessors and the City.  (Amended Lagoon Agreement, signed 1/13/05.)

was spilling into Hecker Creek (which flows into the Yellow River) and caused a massive fish kill.  The Iowa Department of Natural Resources became involved. The City made a strategic decision to leave the industrial wastewater treatment business.  The City negotiated with the two industries and the Environmental Protection Agency and proposed a plan for dealing with the industrial wastewater.

To move forward on this plan, the City and Agriprocessors entered into the October 4, 2001 Real Estate Lease for the Lagoon Property (the "Lagoon Property Lease").  The City agreed to construct a mechanical wastewater treatment facility and associated storage lagoons on the Lagoon Property for the exclusive treatment of water generated by Agriprocessors.  Following completion of construction, Agriprocessors would operate and maintain the facility.  The term of the Lagoon Lease was twenty (20) years.  It granted to the City two easements: a construction easement and a piping easement.  On July 28, 2003, Agriprocessors and the City entered into a second lagoon lease.[2]

The final of the three original agreements involved here deals with the Well Property.  On April 11, 2005, Agriprocessors and Nevel entered into a Deep Water Well Lease (the "Well Property Lease").  It provided Agriprocessors use of the Well Property for a term of fifty (50) years, at a fee of $10,000.00 per year.

---

[2] Agriprocessors and the City entered into an Amendment to the Lagoon Lease and Second Lagoon Lease on July 12, 2004.  The terms of the second lagoon lease and lease amendments are not relevant to the current action.

Agriprocessors agreed to construct the well, operate the well at its cost, and obtain

and maintain necessary permits.  The well provided water to the processing plant.

In spite of the express terms of the lease, Nevel never billed Agriprocessors for the

annual fee and Agriprocessors never made any rental payments to Nevel.

This lack of billing and payment evidences the informal, intertwined

relationship between Nevel and Agriprocessors.  During the negotiation and

signing of the Lagoon Agreement and the Well Lease, the Nevel representative

was "Heshy" Rubashkin, and Agriprocessors' representative was his brother

Sholom Rubashkin.  Heshy remains the sole shareholder of Nevel.  He testified as

the Nevel representative at the confirmation hearing.

On March 2, 2009, Nevel filed this Chapter 11 case.  That same date, SHF

obtained an operating permit for the well located on the Well Property.  It appears

that Nevel and SHF (successor to Agriprocessors) have operated status quo up to

this point with one exception—no rent has been invoiced or paid up to the time of

Nevel's confirmation hearing.

The issues before the Court arise from Nevel's Third Amended Chapter 11

Plan.  Article VIII of that Plan provides for the treatment of executory contracts

and unexpired leases.  That article specifically addresses both the Lagoon and Well

Properties.  Article VIII states in relevant part:

> The reorganized Debtor assumes the Lease and Agreement as between
> Debtor and Agri Processors, Inc., entered October 4, 2011.  This lease

7

agreement grants to Agri Processors, Inc., use of the Lagoon Property
. . . and [provides that Nevel will] convey such property "at such time
as the legal description of the Leased Property has been determined."
The assumption serves a business purpose in limiting Nevel Properties
Corporation exposure to Environmental liability issues, taxes on the
Lagoon property, and monitoring the Lagoon properties.

The reorganized Debtor rejects the Deep Water Well Lease –
Water Line And Access Easements, as between Debtor and Agri
Processors, Inc., entered into on April 11, 2005.  This lease relates to
well water property more particularly described as Well Lease Area in
Lot 10 in the Northwest Quarter of the Southwest Quarter of Section
32, Township 96 North, Range 6 West of the 5th P.M., Allamakee
County, Iowa (described more fully on Page 5 of Exhibit A to this
Disclosure Statement, Parcel II & III).  The rejection of this current
lease agreement allows the Debtor to no longer be subject to a lease
agreement significantly under the Fair Market Value of the well
property.  The current lease significantly undervalues the well usage,
and the amortization of the cost of well development.  Additionally,
the current Leasee has never paid the rent nor the real estate taxes as
provided by the Lease, further subjecting Debtor to financial hardship.
A new lease that reflects the Fair Market Value of the well usage, and
a Leasee who meets the financial obligations of the lease, will further
benefit the estate and creditors.

(Third Amended Plan, at Art. VIII.)

SHF objects to confirmation of Nevel's Third Amended Plan.  SHF argues

Nevel's Plan should not allow assumption of the Lagoon Property lease without

Nevel conveying SHF its interests in the Lagoon Property.  SHF also argues Nevel

should not be allowed to reject the Well Property lease for several reasons.  First,

SHF argues the Well Lease is not an executory contract that can be assumed and/or

rejected.   Second, SHF argues that rejection of the lease is a collateral attack on

Agriprocessors' bankruptcy proceedings.  Third, SHF argues that if the Well

Property lease is an executory contract, SHF may exercise its right to remain in possession of the property for the remaining term of the lease. Fourth, SHF argues it has legal title to the well and equipment, and only lacks title to the land itself. Finally, SHF argues that Nevel has waived the right to reject the lease.

SHF asserts that its arguments, collectively and individually, show the Plan is not proposed in good faith under 11 U.S.C. § 1129(a)(3) and is not feasible under § 1129(a)(11). Nevel disagrees. Nevel first questions SHF's standing to make these objections. Nevel also argues that each of SHF's arguments fails on its merits. In response to SHF's argument that the Lagoon Property already should have been transferred to SHF, Nevel stated its intention of transferring the property to SHF as soon as the event triggering the transfer—a final legal description of the property—has been completed. Nevel claims a legal description has not been completed.

In response to SHF's objections to the Plan's treatment of the Well Property Lease, Nevel argues that SHF failed to obtain any interest in the Well Property from the Agriprocessors bankruptcy. Nevel argues SHF has no rights to assert under that lease. Nevel argues this lack of interest in the Well Property defeats all of SHF's Well Property Lease arguments. Nevel also asserts that SHF's arguments on the Well Lease fail for several additional reasons. Nevel argues it has satisfied all the confirmation requirements including the "good faith" and "feasibility"

requirements of § 1129(a)(3) and (11).

## CONCLUSIONS OF LAW AND DISCUSSION

### A.   Plan Confirmation – 11 U.S.C. § 1129(a)

"Only a plan that meets the requirements set forth in § 1129(a) can be

confirmed.  11 U.S.C. § 1129(a).  Except for § 1129(a)(8), each of the

requirements is mandatory."  In re View Cleveland, LLC, No. 09-55035, 2010 WL

5240044, at *1 (Bankr. N.D. Ohio Oct. 25, 2010).  "Subsection 1129(a) [of the

Bankruptcy Code] provides the requirements that a plan must meet in order to gain

confirmation from the Bankruptcy Court.  11 U.S.C. § 1129(a) ('The court shall

confirm a plan only if all of the following requirements are met . . . .')."  In re

Philadelphia Newspapers, LLC, 599 F.3d 298, 321 (3d Cir. 2010).  "In order to

confirm a Chapter 11 Plan, the Court must find that each of the required elements

of 11 U.S.C. § 1129(a) have been met."  In re Gilbertson Rest. LLC, No. 04-00385,

2005 WL 783063, *4 (Bankr. N.D. Iowa Apr. 4, 2005) (citing In re Internet

Navigator Inc., 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003)); see also In re

Riverbend Leasing LLC, 458 B.R. 520, 525 (Bankr. S.D. Iowa 2011); In re Reuter,

427 B.R. 727, 769 (Bankr. W.D. Mo. Apr. 14, 2010); In re Bryant, 439 B.R. 724,

738-39 (Bankr. E.D. Ar. Oct. 8, 2010).  "The proponent of the plan bears the

burden of proof with respect to each element of § 1129(a) under a preponderance

of the evidence standard."  In re Gilbertson Rest. LLC, 2005 WL 783063, at *4.

10

Section 1129(a) specifically requires that a plan be proposed in good faith. 11

U.S.C. § 1129(a)(3). It also requires the plan to be feasible. 11 U.S.C. §

1129(a)(11) (Confirmation of the plan "is not likely to be followed by the

liquidation, or the need for further financial reorganization, of the Debtor . . . under

the plan, unless such liquidation or reorganization is proposed in the plan."). SHF

argues that confirmation must fail under these two provisions.

SHF argues the Plan is not proposed in good faith because Nevel attempts to

assume the Lagoon Property lease without fulfilling its necessary obligations and

to reject the Well Property lease improperly and not in accordance with the law.

SHF argues the Plan is not feasible because of these same deficiencies, and

because of inadequate funding. Nevel argues SHF has no standing to raise these

objections, and even if it did, those arguments have no merit.

### B.   Standing

Nevel has raised the threshold issue of standing, which must be addressed

before reaching the merits of SHF's objections. Nevel argues that SHF does not

have standing to bring objections regarding feasibility or bad faith, because SHF is

not a creditor. The Court disagrees.

"A party in interest may object to confirmation of a plan." 11 U.S.C. §

1128(b). See also Drake, W. Homer Jr. & Strickland, Christopher S., Chapter 11

Reorganizations § 14:27 Objections to Plan Confirmation (2d ed. 2011) ("Any

11

party in interest may object to a plan to the extent that it does not meet the

confirmation criteria posed under the Bankruptcy Code.").  "Generally, it is only

an aggrieved party, whose own interests are impacted by particular plan provisions,

[who] may object to those provisions at confirmation."  <u>In re Applied Safety, Inc.</u>,

200 B.R. 576, 587 (Bankr. E.D. Pa. 1996).  "Thus, a party cannot successfully

object to plan provisions that have no effect on the party's rights and interests

thereunder.  A party may therefore not object to a plan raising rights that belong to

third parties who are not objecting."  <u>Id.</u>

Section 1109(b) of the Code specifically notes that "[a] party in interest . . .

may appear and be heard on any issue in a case under this chapter."  11. U.S.C. §

1109(b).  It further notes that a party-in-interest includes "the debtor, the trustee, a

creditors' committee, an equity security holders' committee, a creditor, an equity

security holder, or any indenture trustee . . . ."  <u>Id.</u>

> [T]he list of persons/entities who may be parties in interest in § 1109
> is not exhaustive.  Consequently, a bankruptcy court must look at the
> facts and circumstances in each case to determine if a person or entity
> is a party in interest.  The bankruptcy court in <u>In re Ionosphere Clubs,
> Inc.</u>, 101 B.R. 844 (Bankr. S.D.N.Y. 1989) held:
>
>> The bankruptcy court must determine a party's status on
>> a case by case basis to see if this party has a sufficient
>> stake in the proceeding which would require
>> representation . . . . [O]ne purpose of the Code is to
>> convert the bankrupt's estate into cash and distribute it
>> among creditors. . . . The term party in interest should be
>> interpreted in light of this purpose.  Consequently the
>> party requesting standing must either be a creditor of a

> debtor to invoke the court's jurisdiction or be able to
> assert an equitable claim against the estate.

Id. at 849.

In re Play Wire Wheels, Ltd., 421 B.R. 851, 855 (Bankr. N.D. Ohio 2009).

> Section 1141(a) of the Bankruptcy Code provides:
>
> Except as provided in subsections (d)(2) and (d)(3) of this section, the
> provisions of a confirmed plan bind the Debtor, any entity issuing
> securities under the plan, any entity acquiring property under the plan,
> and any creditor, equity security holder, or general partner in the
> debtor, whether or not the claim or interest of such creditor, equity
> security holder, or general partner is impaired under the plan and
> whether or not such creditor, equity security holder, or general partner
> has accepted the plan.

11 U.S.C. § 1141. "'A bankruptcy court confirmation order generally is treated as

res judicata.'"  In re Scott Cable Comm'n, Inc., 259 B.R. 536, 543 (D. Conn. 2001)

(quoting In re Linkous, 990 F.2d 160, 162 (4th Cir. 1993)).

The Court concludes that SHF is "a party in interest" as it has an equitable

claim against the estate.  At a minimum, it has an equitable claim regarding its

rights in the Lagoon Property.  SHF's rights regarding the Lagoon Property would

be subject to res judicata, if the Plan were confirmed.  Accordingly, the Court finds

that SHF has at least general standing to object to the Plan's treatment of the

Lagoon Property.  As to the Well Property, SHF could be a party-in-interest if it

demonstrates it has rights—legal or equitable—in the Well Property lease.  SHF's

rights in the Well Property lease—and standing to assert issues related to it—will

be discussed below.  In sum, the Court finds SHF has standing to assert all arguments unless specifically noted otherwise.

### C.    Good Faith

SHF's main argument appears to be that the Plan was not proposed in good faith.  Section 1129(a)(3) of the Bankruptcy Code "requires that '[t]he plan has been proposed in good faith and not by any means forbidden by law,' the term 'good faith' is left undefined by the Code."  Hanson v. First Bank of S.D., N.A., 828 F.2d 1310, 1315 (8th Cir. 1987) (overturned on other grounds) (quoting 11 U.S.C. § 1129(a)(3)); see In re Barger, 233 B.R. 80, 83-84 (B.A.P. 8th Cir. 1999); In re Gilbertson Rest., LLC, 2005 WL 783063, at *4.  "In the context of a Chapter 11 reorganization, however, a plan is considered proposed in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'"  Hanson, 828 F.2d at 1315 (quoting In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)); see In re Riverbend Leasing LLC, 458 B.R. 520, 529 (Bankr. S.D. Iowa 2011) ("'The term good faith is not defined by the Bankruptcy Code, but in this Circuit, a Chapter 11 Plan is considered proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'").

> The important inquiry is the plan itself. The court must determine whether the plan constitutes an abuse of the provisions, purpose or

spirit of the Code.  The court should judge each case on its own facts after considering the totality of the circumstances surrounding the plan and the bankruptcy filing.

In re Riverbend Leasing LLC, 458 B.R. at 529 (citations omitted).

SHF presents three arguments in support of its position that the Plan was not proposed in good faith.  The first argument deals with the Plan's treatment of the Lagoon Property and Agreement.  The second argument is based on the Plan's treatment of the Well Property and Lease.  The third argument is a general claim that Nevel's principals are not acting in good faith.  Each of SHF's arguments will be reviewed independently.

## 1. The Lagoon Property

SHF's first lack of good-faith objection concerns the Plan's treatment of the Lagoon Property Lease.  The Plan provides the following with regard to the Lagoon Property lease:

> The reorganized Debtor assumes the Lease and Agreement as between Debtor and Agri Processors, Inc., entered October 4, 2001.  This lease agreement grants to Agri Processors, Inc., use of the Lagoon Property . . . and to convey such property 'at such time as the legal description of the Leased Property has been determined.'  The assumption serves a business purpose in limiting Nevel Properties Corporation exposure to Environmental liability issues, taxes on the Lagoon property, and monitoring the Lagoon properties.

(Plan, art. VIII.)  The Lagoon Agreement referenced in the Plan provides:

> Grantor [Nevel] hereby grants to Grantee [Agriprocessors] all rights in the [Lagoon Property] which are to be granted by [Agriprocessors] to the City in the Lease.  [Nevel] further agrees that at such time as the

15

legal description of the [Lagoon] Property has been determined, [Nevel] will convey the [Lagoon] Property to [Agriprocessors] by a general warranty deed free and clear of liens and encumbrances, subject to zoning and other ordinances and to easements, restrictions, covenants and reservations of record.

(Lagoon Agreement, signed 11/4/01.)  In short, SHF argues the Plan lacks good faith because it does not immediately convey the Lagoon Property and necessary easements to SHF.

At the confirmation hearing, Heshy Rubashkin, Nevel's sole stockholder, testified that Nevel intended to convey the Lagoon Property to SHF when an appropriate legal description is completed.  In response, SHF argues that various legal descriptions of the property have been in existence since 2005, and thus, the Court should require that Nevel deed the Lagoon Property to SHF upon confirmation.  SHF also points out that conveyance of the deed does not provide access to the Lagoon Property and Nevel should also be required to convey access and utility easements.

Heshy Rubashkin's testimony answered SHF's objection.  He indicated that the reason the Lagoon Property had not been conveyed was because the legal description had not been completed—largely due to recent issues concerning road and utility easements.  He stated that two different deeds, with two different legal descriptions, had been provided to him in the 48-hours preceding the hearing.  When the legal descriptions are completed, Mr. Rubashkin unequivocally stated he

16

would make all the required conveyances.

The Court finds the parties have failed to jointly present a legal description of the Lagoon Property that the parties agree upon.  Heshy Rubashkin testified under oath, and the Plan's language makes clear, that it is his and Nevel's intention to convey the Lagoon Property once a legal description is obtained, as indicated in the Plan.

The Court also rejects SHF's argument that the Plan's failure to mention that SHF has easement rights, both roadway and utility access relating to the Lagoon Property, requires denial of confirmation.  The argument is not supported by any authority or documentation.  Further, the Court finds no language in the Lagoon Agreement which would require the conveyance and access SHF seeks.  The Lagoon Agreement provides for the transfer of the Lagoon Property, but does not provide for a separate transfer of easement rights.  The Court will not order Nevel to transfer more than what is provided for in the Lagoon Agreement and subsequent amendment.  Accordingly, SHF's objection that the Plan was not proposed in good faith regarding the Lagoon Property is overruled.

### 2.  The Well Property

SHF next argues that the Plan was not proposed in good faith because Nevel attempts to reject the Well Property Lease.  SHF's pre-hearing objection to the Plan presents two arguments supporting that assertion: 1) section 365 is

inapplicable because the Well Property Lease and easement conveys a property

interest; and 2) Debtor may not dispossess SHF of the Well Property under §

365(h).  While only two arguments were presented initially, SHF's post-hearing

brief presents five arguments regarding Nevel's lack of good faith in treating the

Well Property.  Those arguments are: (a) that the Well Property Lease is not an

executory contract that Nevel can reject under § 365, because it is an easement that

conveys a property interest; (b) that Nevel's attempted rejection of the Well

Property Lease is an improper collateral attack on the Agriprocessors bankruptcy

sale, where SHF claims it acquired an enforceable Lease; (c) that even if the Well

Property Lease is rejected, SHF can continue possession of the Well Property until

the end of the lease under § 365(h); (d) that SHF owns the well equipment; and (e)

that Nevel has waived any "deemed rejection" of the Well Property in the

Agriprocessors bankruptcy.  During the hearing, SHF presented four of these five

arguments, failing to specifically present the waiver claim.  Nevel counters SHF's

arguments claiming that SHF has no ownership rights in the Well Property—and

thus no standing or substantive right to protect in objecting to the rejection of the

Well Property Lease.  The Court agrees with Nevel and rejects all five of SHF's

arguments.

### a.  Executory Contract

SHF argues the Well Property Lease is not an executory contract and cannot

be rejected by Nevel under § 365(a).  SHF further argues that since it is not an

executory contract, no subsection of § 365 applies.

Section 365 provides that "the trustee . . . may assume or reject any

executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Under

the Bankruptcy Act, the following definition of executory contract was commonly

used: "'a contract under which the obligation of both the bankrupt and the other

party to the contract are so far unperformed that the failure of either to complete

performance would constitute a material breach excusing the performance of the

other.'"  In re Knutson, 563 F.2d 916, 916 (8th Cir. 1977) (quoting V. Countryman,

Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973)).

That definition has been adopted in cases interpreting the Bankruptcy Code.

> The term "executory contract" is not defined in the bankruptcy code.
> The Eighth Circuit, however, has defined the term executory contract
> (in the context of bankruptcy) to mean a contract under which the
> bankrupt and the other party both are obligated, that such obligation
> remains unperformed by either party, and that failure of either to
> complete performance would constitute a material breach excusing the
> other of performance.

Gouveia v. Tazbir, 37 F.3d 295, 298 (7th Cir. 1994); see also In re A'Hearn, No.

11-00615, 2011 WL 4704235, *5 (Bankr. N.D. Iowa Oct. 4, 2011); In re Craig,

144 F.3d 593, 596 (8th Cir. 1998).

SHF is correct that the Well Property Lease is not an executory contract.

Nevel has no obligation to perform under the Lease, and thus no executory contract

is formed.  See In re Knutson, 563 F.2d at 916.  The fact that the Well Property

Lease is not an executory contract, however, does not make § 365 inapplicable.

Section 365(a) specifically allows for rejection of "any executory contract or

unexpired lease."  11 U.S.C. § 365(a) (emphasis added).  See In re Burival, 613

F.3d 810, 812 (8th Cir. 2010) (citing El Paso Props. Corp. v. Gonzales (In re Furr's

Supermarkets, Inc.), 283 B.R. 60, 66 n.9 (B.A.P. 10th Cir. 2002)) (analyzing term

"unexpired lease" under § 365(d)(3)); Matter of JAS Enters., 180 B.R. 210, 215

(Bankr. D. Neb. 1995).

SHF argues the Well Property lease is not really a lease agreement under §

365, but instead is an easement.  As an easement, SHF asserts it holds a valid

property right in the real property: "[T]he written legal description [of the Well

Property Lease] clearly indicates that the deep water well is located on a section of

property that was transferred to Agriprocessors pursuant to an easement, not a

lease agreement, and therefore constitutes a property right."  (SHF Obj., ECF No.

461, at 8.)

The Court disagrees.  The Well Property Lease and easements functioned as

an unexpired lease agreement under § 365.  The Well Property Lease is titled

"Deep Water Well Lease – Water Line and Access Easements."  Paragraph one

provides for lease of the premises.  In paragraph two, it provides a grant of non-

exclusive easements to access the Well Property.  The "non-exclusive easement"

20

was subject to termination at the time of termination of the agreement, and thus

was—by its terms—a temporary easement.  A temporary easement is similar in

style to a lease.  See Mar. & NE Pipeline, LLC v. 0.714 Acres of Land, More or

Less, in Danvers, Mass., No. 02-11054, 2007 WL 2461054, *9 (D. Mass. Aug. 27,

2007) (An appraiser "valued the temporary easement taken on [Defendant's]

property by estimating the fair rental value of the property taken, which is the

general measure of compensation for the taking of a temporary easement.") (citing

Kimball Laundry Co. v. United States, 338 U.S. 1, 6-7 (1949); Heydt v. United

States, 38 Fed. Cl. 286, 305 (Fed. Cl. 1997); Fowler Irrevocable Trust 1992-1 v.

City of Boulder, 992 P.2d 1188, 1196 (Colo. App. 1999); Mich. Wis. Pipeline Co.

v. Herbert, 488 So.2d 754, 757 (La. Ct. App. 1986); State v. Sun Oil Co., 390 A.2d

661, 668 (N.J. Super. Ct. Law Div. 1978)).  Courts have used fair rental value

methodology in the context of valuing temporary easements.  See Vector Pipeline,

L.P. v. 68.55 Acres of Land, 157 F. Supp. 2d 949, 959 (N.D. Ill. 2001) ("With a

temporary easement the valuation of damage is indeed measured by the time of

occupancy or use."); City of Mission Hills v. Sexton, 160 P.3d 812, 822 (Kan.

2007) (listing cases).  Further, "rent" is a payment made under a lease.  Black's

Law Dictionary "Lease" (9th ed. 2009) ("Lease" means "To grant the possession

and use of (land, buildings, rooms, movable property, etc.) to another in return for

rent or other consideration.").  Accordingly, the temporary nature of the Deep

Water Well Lease-Water Line and Access Easement makes the totality of the

arrangement the functional equivalent of a lease.  Consequently, SHF's argument

is not persuasive.  The Well Property Lease is an "unexpired lease" under § 365.[3]

Thus, the Court rejects SHF's argument that § 365 is inapplicable.

### b.  Collateral Attack on the Agriprocessors Bankruptcy

SHF next argues Nevel's Plan is improper because SHF purchased the Well

Property Lease in the Agriprocessors bankruptcy, and Nevel's attempt to reject the

Well Property Lease is essentially a collateral attack on the Agriprocessors

bankruptcy proceedings.  In response, Nevel argues that SHF holds no interest in

the Well Property Lease under § 365(d)(4)(A) and thus cannot assert it acquired

such an interest in the Agriprocessors' bankruptcy.  Section 365(d)(4) provides:

> (A) Subject to subparagraph (B), an unexpired lease of nonresidential
> real property under which the Debtor is the leasee **shall be deemed
> rejected**, and the trustee shall immediately surrender that
> nonresidential real property to the lessor, **if the trustee does not
> assume** or reject the unexpired lease by the earlier of –
>
>     (i) the date that is **120 days after the date of the order for
> relief**; or
>     (ii) the date of the entry of an order confirming a plan.
>
> (B)(i) The court may extend the period determined under
> subparagraph (A), prior to the expiration of the 120-day period, for 90
> days on the motion of the trustee or lessor for cause.

---

[3] To the extent the Well Property Lease could be considered an "expired
lease," based on the Agriprocessors Trustee's failure to assume the lease, as
discussed in the subsequent section, the Court finds that the treatment of the Well
Property Lease in the Plan is superfluous as the lease had already been rejected.

(ii) If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

11 U.S.C. § 365(d)(4)(A)-(B) (emphasis added).

Nevel argues that Agriprocessors' Trustee did not assume or reject the lease in that bankruptcy within the 120-day period, and thus it was "deemed rejected." See id. Therefore, SHF contends the Agriprocessors Trustee could not assign or sell a lease that has already been rejected by operation of law.

SHF does not argue that the Well Property Lease was actually assumed in the 120-day period under the statute. It also makes no argument that the Trustee attempted to preserve the Lease under the procedures required in § 365(d). Instead, SHF argues that Nevel's arguments on this issue ignore what amounted to an implicit assumption of the Lease and are essentially "collateral attacks" on the Agriprocessors bankruptcy sale based on the following rationale:

> While still within the 120 day time limit, and only two days after Agriprocessors obtained its operating permit for the well, the Chapter 11 Trustee filed a Notice of Form of Asset Purchase Agreement. Included in the form attached to the Motion was a listing for all machinery, equipment, interests in real estate, the water treatment plant, and all fixtures. It was clear from the filings that the Trustee did not intend to lose assets necessary for the operation of the Agriprocessors plant and that these filings took place during the 120 day time period for the assumption or rejection of commercial leases.

(SHF Memo, ECF No. 529, at 23) (citation omitted). SHF further argues that under the Sale Order SHF purchased a "package" of assets, all of which were

necessary for the continued and successful operation of the facility.  SHF's

argument appears to be that because the sale was allegedly made under these

conditions, the Well Property Lease was somehow not "deemed rejected" under §

365(d)(4).  In fact, SHF concludes that because the well is necessary for facility

operations, the Well Property Lease should actually be deemed to have "clearly"

been assumed by the bankruptcy trustee and purchased by SHF.[4]

The Court rejects SHF's arguments.  SHF's claim that the Agriprocessors

Bankruptcy Trustee functionally assumed the Well Property Lease—though not

under the requirements of § 365(d)(4)(A)–(B)—is not persuasive and lacks support

in the law.  None of the steps taken by the Agriprocessors Bankruptcy Trustee

acted to assume the Lease.

The procedures for accepting or rejecting a lease are spelled out in great

detail in § 365(d)(4).  They are enforced by Courts according to their terms.  In re

Tubular Tech., LLC, 348 B.R. 699, 708 (Bankr. D.S.C. 2006); Matter of JAS

Enters., 180 B.R. at 215.  If not assumed within 120 days of the order for relief, the

lease is deemed rejected.  Section 365 does not leave room for SHF's argument

about a "clear" intent to assume or a "clear" act that functionally assumed the

---

[4]  The Court notes that although the post-hearing briefing presents this
argument, at the time of hearing, SHF's counsel indicated that Nevel was wrong to
assume that the wells were necessary for the operation of the facility.  This
statement was not further explained, but the Court notes said statement contradicts
the argument now presented by SHF.

Lease.  In a case with facts analogous to this, the Court held "the Bankruptcy Code does not permit a debtor to assume an unexpired lease without court approval and prior notice to creditors."  JAS Enter., Inc., 180 B.R. at 215 (citing § 365(a); Fed. R. Bankr. P. 6006, 9014 (1994); 1 Lawrence P. King, Collier on Bankruptcy § 365.03 (1994)).

Other portions of § 365 make even more plain that there was no valid "assumption" of any sort.  The Code allows assumption only if any default in rent payments was cured.  11 U.S.C. § 365(b).  The Trustee must also ensure post-petition rent due was paid.  In re Burival, 613 F.3d 810, 842 (8th Cir. 2010).  It is undisputed no rent has been paid and nothing has been cured.  SHF's argument that there has been an assumption of the Well Property Lease thus fails as a matter of law.  SHF's argument that Nevel is attempting to collaterally attack the Agriprocessors bankruptcy depends entirely on the conclusion that the Well Property Lease was functionally assumed and conveyed as part of the asset sale. Because SHF has failed to show the Well Property Lease was assumed, this argument about an improper collateral attack of a prior bankruptcy has no merit.

The above discussion shows SHF lacks Agriprocessors' interest in the Well Property Lease.  This conclusion is dispositive of most of the other issues SHF has raised related to the Well Property Lease.  The Court will nevertheless separately address the merits of those issues.

### c.  Rights under 11 U.S.C. § 365(h)

SHF next argues that, even if the Lease can be rejected by Nevel, under §

365(h), SHF is still entitled to retain rights under the Lease and remain in

possession of the Well Property for the remainder of the lease term.  Section

365(h) provides:

> (h)(1)(A) If the trustee rejects an unexpired lease of real property under which the Debtor is the lessor and—
>
> > . . .
> >
> > (ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.
>
> (B) If the leasee retains its rights under subparagraph (A)(ii), the leasee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease and for the term of any renewal or extension of such lease, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the Debtor under such lease, but the lessee shall not have any other right against the estate or the Debtor on account of any damage occurring after such date caused by such nonperformance.
>
> . . . .
>
> (D) In this paragraph, "leasee" includes any successor, assign, or mortgagee permitted under the terms of such lease.

11 U.S.C. § 365(h)(1)(A), (B), & (D).

SHF's argument that it is entitled to remain in possession under § 365(h) is not persuasive.  Again, the deemed rejection of the lease under § 365(d)—discussed above—is dispositive.  Section 365(h) applies only to leasees.  SHF is not a leasee because the Agriprocessors Bankruptcy Trustee did not sell or assign the Lease interest to SHF because it had no lease to sell.  The Lease was already deemed rejected.  Thus, SHF did not purchase the Well Property Lease in the bankruptcy sale.  It is not a "leasee" under § 365(h) and has no rights to enforce.

### d.  Equitable Treatment of SHF's Fixtures

SHF argues Nevel's Plan fails to provide equitable treatment for SHF's interest in the fixtures that are part of the well.  SHF's initial objection to confirmation does not raise this argument.  During the hearing, SHF's counsel made one passing statement regarding the difference between an easement for the equipment and a lease on the property.  At no time before post-hearing briefing, did SHF raise the constitutional "takings" argument it now attempts to present.  The Court does not believe that this argument is properly before the Court.  "[A]rguments raised for the first time in a reply brief as opposed to the [party's] opening brief are deemed waived."  In re Sokolik, 635 F.3d 261, 268 (7th Cir. 2011).  SHF's failure to properly raise the argument means the Court rejects it as a basis for denying confirmation.  However, even if the Court were to assume it was properly raised, the Court finds the argument to be without merit.

SHF argues that it owns the equipment used to maintain and operate the well

and that the equipment cannot be transferred to Nevel upon rejection of the Well

Property Lease.  SHF contends such transfer would be a taking.  SHF argues:

> At paragraph 9 of the Well Lease and Easement Agriprocessors
> agreed to construct the well, operate the well at its cost and to obtain
> and maintain necessary permits.  It is clear from this language that
> although Nevel was leasing raw unimproved land that it was
> Agriprocessors that was to install its own well on the real estate.

(SHF Memo, ECF No. 529, at 25-26.)

Agriprocessors could not, however, transfer to SHF a greater title than it

held in those assets.  The Well Property Lease makes clear that Agriprocessors did

not hold title to the fixtures SHF now tries to claim.  The Well Property Lease

addressed ownership of this property and provides:

> 11. <u>Surrender of Premises and Easements.</u>  Agri agrees that upon the
> termination of this Agreement, it will: (i) surrender, yield up and
> deliver to Nevel the Premises and the Easements, including, but not
> limited to, all ownership and/or other rights of Agri in the well, and
> the road, utilities and waterlines on the Premises and in the
> Easements, and will promptly assign and/or transfer to Nevel Agri's
> ownership and/or other rights in the Well and the road, utilities and
> waterlines on the Premises and in the Easements, and the Well and
> such associated items shall, without any further action, **upon the
> termination of this Agreement,** become the **sole property of Nevel**
> and, to further evidence the transfer, Agri will, if requested by Nevel,
> execute and deliver such documents of conveyance as Nevel may
> reasonably request . . . .

(Well Property Lease, Exh. F, at 4 (emphasis added).)  As noted above, the Lease

was terminated by both the deemed rejection under § 365(d) and SHF's failure to

ever pay rent.  Nevel's rejection of the Lease here also terminates the Lease.  Upon

termination, the Lease specifically provides that the fixtures are property of

Nevel—not SHF.  Further, any argument that the transfer is an unconstitutional

taking is without merit as there is no state action.  Cunninghan v. Barrington

Square Condo. Ass'n, No. 4:99cv1445, 2000 WL 34507996, *3 (E.D. Mo. Feb. 16,

2000) ("[T]he Takings Clause of the Fifth Amendment, made applicable to the

states by the Fourteenth Amendment, requires state action to invoke its

protections.").  SHF's argument that the Plan was not proposed in good faith

because Nevel maintains the fixtures attached to the Well Property is simply

without merit.

### e.  Waiver

SHF next argues Nevel waived the right to argue the Lease was terminated

and/or not assumed.  SHF asserts a number of reasons the Court should find a

"waiver" here: 1) the Agriprocessors' bankruptcy order dated July 20, 2009,

included a "dragnet" clause that would include the Well Property Lease; 2) the

express language of the contract shows it was the party's intent to include the Well

Property Lease in the purchase; and 3) Nevel's actions acquiescing in the transfer

and its failure to invoice SHF for rent waived the arguments it is making here.

SHF does not explain how the contract language itself, or the "dragnet clause"

specifically, operate as a waiver.  The "dragnet clause" could not apply to convey,

29

or otherwise validate, a lease already rejected.  The argument that Nevel

consistently took actions which contradict its current position is also without merit.

Other courts addressing similar arguments have rejected them.  In re George, 177

F.3d 885, 887 (9th Cir. 1999); Matter of JAS Enters., 180 B.R. at 214.  In George,

the court found that even when a landlord accepted rent payments after the lease

was "deemed rejected" the landlord had not waived its § 365(d) arguments.  177

F.3d at 887.  In JAS Enterprises, the court rejected various arguments by both

parties—and in particular rejected arguments that the landlord waived § 365(d)

rights because it allowed debtor to remain on land after the § 365(d)(4) "deemed

rejection."  180 B.R. at 214.  See also In re Wedemeier, 237 F.3d 938, 941 (8th

Cir. 2001) (citing JAS Enters., 180 B.R. at 216).   This Court reaches the same

conclusion and rejects SHF's waiver argument.

### f.  Bad-Faith Generally

SHF makes a final bad-faith argument in general terms by asking the Court

to find bad-faith on the totality of the circumstances.  In particular, SHF argues that

the personal benefit to be gained by Heshy Rubashkin under the Plan should be

considered in light of a judgment entered in favor of the FDIC as Receiver for

Omni National Bank against Sholom Rubashkin, Heshy Rubashkin, and Aaron

Rubashkin, jointly and severally, in excess of $300,000.00.  SHF argues the Court

should take judicial notice of the judgment entered by the United States District

Court for the Northern District of Iowa in December 2010.

The Court does not believe this judgment—standing alone or in connection with SHF's other arguments on lack of good faith—is relevant. The judgment does not show or even tend to show that Nevel's attempt to reorganize itself— lacks good faith. The fact that Heshy Rubashkin <u>might</u> benefit financially if the Plan is successful is also not relevant. In fact, even if the Court were to consider that judgment as somehow relevant, the possibility of a profit to Heshy Rubashkin could be seen equally as a good-faith effort to gain a source from which to pay fines, fees, or other expenses from the fallout of the events of the last several years. SHF's arguments do not establish lack of good faith under the totality of the circumstances.

The Court thus rejects all of SHF's arguments that the current Plan was not proposed in good faith.

### D. Feasibility

SHF's next argument is that the Plan is not feasible. It makes all the same arguments it made in the good-faith section. It also argues against feasibility because the plan lacks adequate funding. The Court rejects the feasibility arguments that were also made on bad-faith grounds for the same reasons noted above.

The remaining feasibility issue to address comes from SHF's argument that

the Plan is inadequately funded.  The Court finds SHF has no standing to present this feasibility argument, and even if it did, the argument is without merit.

"Section 1129(a)(11) provides that the court shall confirm a plan only if '[c]onfirmation . . . is not likely to be followed by liquidation, or the need for further financial reorganization, of the Debtor . . . unless such further . . . reorganization is proposed in the plan.'"  In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985) (quoting 11 U.S.C. §1129(a)(11)); see In re Danny Thomas Prop. II Ltd. P'ship, 241 F.3d 959, 962 (8th Cir. 2001).  "One of the requirements for confirmation is that the debtor 'be able to make all payments under the plan and comply with the plan.'"  In re Richards, No. 03-02487, 2004 WL 764526, *2 (Bankr. N.D. Iowa Apr. 2, 2004) (quotation omitted).  The Eight Circuit has held that "'[i]n determining whether [a plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.'"  In re Monnier Bros., 755 F.2d at 1341 (quoting United Prop., Inc. v. Emporium Dep't Stores, Inc., 379 F.2d 55, 64 (8th Cir. 1967)); see In re Gilbertson Rest., 2005 WL 783063, at *5.

> To determine the feasibility of a plan, the court must ascertain the probability of actual performance of the provisions of the plan.  In re Mosbrucker, 227 B.R. 434, 437 (B.A.P. 8th Cir. 1998), aff'd 198 F.3d 250 (8th Cir. 1999).  Feasibility of a Debtor's plan is a factual determination.  Id.

> This feasibility standard requires the Court to determine whether the plan offers a reasonable prospect of success and is

> workable.  In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985).
> The test is whether the things which are to be done after confirmation
> can be done as a practical matter under the facts.  In re Clarkson, 767
> F.2d 417, 420 (8th Cir. 1985).
>
>        The Eighth Circuit's feasibility test considers whether
> provisions in a plan are achievable given the unique facts of the case.
> In re Bowman, 253 B.R. 233, 238-39 (B.A.P. 8th Cir. 2000).  This
> Court will only approve a plan if it has a rational likelihood of
> success.  In re Danny Thomas Prop. II Ltd. P'ship, 241 F.3d 959, 963
> (8th Cir. 2001).

In re Richards, 2004 WL 764526, at *2-3.  Success of the plan, however, need not

be guaranteed.  In re Monnier Bros., 755 F.2d at 1341 (citing 5 Collier on

Bankruptcy ¶ 1129.02, at 1129-33).  "Courts generally grant debtors every

reasonable benefit of the doubt in matters concerning plan feasibility in furtherance

of the rehabilitative policies underlying the Code."  In re Richards, 2004 WL

764526, at *3.

The Court has already addressed the test for standing to object at

confirmation.  Again, "[g]enerally, it is only an aggrieved party, whose own

interests are impacted by particular plan provisions, may object to those provisions

at confirmation."  In re Applied Safety, Inc., 200 B.R. 576, 587 (Bankr. E.D. Pa.

1996).  "Thus, a party cannot successfully object to plan provisions that have no

effect on the party's rights and interests thereunder.  A party may therefore not

object to a plan raising rights that belong to third parties who are not objecting."

Id.

SHF does not have standing here to assert this objection.  Whether the Plan is adequately funded does not affect SHF's rights or interests.  The portions of the Plan affecting SHF are limited to issues surrounding the leases and agreements. SHF is not a creditor.  Consequently, SHF does not have standing to bring a feasibility argument regarding the adequacy of funding.  See id.

Despite SHF's lack of standing, the Court will nevertheless discuss feasibility because it is a requirement of confirmation under § 1129.  SHF essentially argues—with little support—that Nevel has not shown it has adequate funding to make the payments required by the Plan.  Nevel responded with evidence of funding.

Mr. Rubashkin testified that Nevel has obtained a loan commitment in the amount of $540,000 from individual parties who have an interest in seeing Nevel succeed.  Nevel has already obtained $200,000 of this money, which is held in his attorney's trust account.  He stated the remainder of the funds would be wired under timelines ordered by this Court.  Mr. Rubashkin indicated that while this was a verbal commitment, the loan was at a zero percent interest rate.  He noted he had made no personal guarantee on the loan and the collateral pledged for the loan was shares of the company.

SHF simply does not believe this evidence is credible.  It argued that Nevel's attorney failed to corroborate Mr. Rubashkin's statements and there was

34

no explanation for why the remainder of the funds had not yet been transferred to the trust account. SHF further argues that the testimony of Candy Seibert, a Nevel representative, shows that the Plan is not feasible. SHF focuses on Ms. Seibert's testimony regarding the current profit and loss statements. It ignores her testimony on the projected profit and loss statements. Contrary to SHF's position, Ms. Seibert indicated that she did not see any problem with Nevel making payments under the Plan unless an unexpected catastrophe occurred. She believed a number of the projected expenses were overestimated, and that there should not be a problem making the payments.

Looking at the totality of the evidence, Nevel has presented enough to establish feasibility. Nevel has secured a loan in the amount of $540,000 by offering creditors shares of the company. The fact that Nevel has already received a portion of these funds, and is holding them in escrow, provides further support that the Plan has a reasonable likelihood of success. See In re Richards, 2004 WL 764526, at *2-3. The Court overrules SHF's feasibility objection and finds the Plan to be confirmable.

**WHEREFORE,** Agri Star Meat & Poultry LLC and SHF Industries, LLC n/k/a SHF Holdings, LLC's Objections to Confirmation of Plan are **OVERRULED**.

**FURTHER**, the debtor-in-possession is given 14 days from the date of this

decision to submit to the Court a proposed confirmation order confirming Nevel's

Chapter 11 Plan.


Dated and entered:    February 17, 2012

_____

THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE